IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Sherry Charlene Rambert,     )
                                 )         Civil Action No. 6:12-2790-MGL-KFM
              Plaintiff,    )
                                 )       **REPORT OF MAGISTRATE JUDGE**
     vs.                       )
                                 )
Carolyn W. Colvin, Acting    )
Commissioner of Social Security,[1]  )
                                 )
              Defendant.   )

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on February 26, 2009, alleging that she became unable to work on February 6, 2009. The applications were denied initially and on reconsideration by the Social Security Administration. On May 3, 2010, the plaintiff

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff and her witness, John Henry Skinner, appeared on December 1, 2010, considered the case *de novo*, and on January 27, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on July 23, 2012. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2.  The claimant has not engaged in substantial gainful activity since February 6, 2009, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq.*, 416.971 *et seq.*).

3.  The claimant has the following severe impairments:  status post ankle fracture, schizoaffective disorder, and post traumatic stress disorder (PTSD) (20 C.F.R. §§ 404.1520(c), 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b).  Specifically, the claimant is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours in an 8-hour day, except that she is limited to occasionally climbing ramps or stairs, stooping, kneeling, crouching and crawling, and never

2

climbing ladders, ropes or scaffolds. The claimant must avoid all exposure to hazards such as machinery and heights and is limited to simple, routine, repetitive tasks with no ongoing interaction with the public.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7.  The claimant was born on January 4, 1964, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. §§ 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from February 6, 2009, through the date of this decision (20 C.F.R. § 404.1520(g), 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

**APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

4

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

*Mental Health*

The plaintiff was 45 years old on her alleged disability onset date, and she was 47 years old on the date of the ALJ's decision. She has a GED and past relevant work as a housekeeper in hotels and motels (Tr. 159). Prior to her alleged onset date, the plaintiff received treatment for her mental impairments at Dorchester County Mental Health Center (Tr. 226-43). During that period, the plaintiff reported experiencing auditory hallucinations and paranoia (Tr. 227, 234). She also informed her provider on February 8, 2007, that follow-through had been a problem in the past, even though she knew she always became sick again. The plaintiff added that since she started Risperdal, she had good symptom control with no hallucinations (Tr. 228). Further, the plaintiff reported to her provider on May 28, 2008, that she had stopped taking her medication several months ago, even though she knew that she needed to continue taking her medication. The provider concluded that her Global Assessment of Functioning ("GAF") score was between 55-60[3] (Tr. 227).

The plaintiff also received treatment from Charleston Mental Health Center (Tr. 312-34). Notes from May 2008 contain a Trauma History including a violent stabbing incident, sexual abuse by the plaintiff's brother during childhood, and physical abuse by her child's father and other males (Tr. 236). The Social, Economic, and Cultural Assessment indicated that the plaintiff had a GED, was unemployed with a past work history including housekeeping and laundry services, was arrested several times for criminal domestic violence including fighting with her child's father, and served 20 to 30 days before being released (Tr. 238). The Appendix to the Clinical Assessment indicated, among other things,

---

[3]GAF ranks psychological, social, and occupational functioning on a hypothetical continuum of mental illness ranging from zero to 100. *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

that the plaintiff suffered from serious interpersonal impairment as a result of being totally socially isolated, lacked intimacy in social relationships, showed an inability to confide in others, and lacked social support (Tr. 325).  The plaintiff's progress summary dated May 2008 to November 2008 noted that her condition could not be assessed, as she only came in for one session (Tr. 330).  The plaintiff's progress summary dated November 2008 to March 2009 also indicated that she was difficult to assess, as her case manager had only met with her on one occasion, at which point she reported that her medication was helpful and she was less paranoid (Tr. 329).

On August 6, 2008, Francis Fishburne, Ph. D., performed a psychological evaluation of the plaintiff upon referral by a disability examiner (Tr. 245-49). Dr. Fishburne reported that the plaintiff was most recently employed in March or April of 2007 and left her job because she was hearing voices (Tr. 245). He noted that she began using alcohol in her youth and drank as much as a quart daily, went through two recovery programs, attended Alcoholics Anonymous in the past, and had remained abstinent from alcohol and marijuana for seven years. Dr. Fishburne reviewed the plaintiff's past and current psychiatric treatment and referred to her multiple arrests for domestic violence (Tr. 245). He reported that the available records included treatment notes dating from October 19, 2006, to May 28, 2008, and indicated that the plaintiff was diagnosed with schizo-affective disorder, polysubstance dependence, and a mood disorder (Tr. 245-46).  Dr. Fishburne noted that the plaintiff did not feel depressed when she was taking her medications, but was depressed daily when she was off them (Tr. 246).  He referred to the plaintiff's past suicide attempt and suicidal ideation about one year before the evaluation.  He reported that the plaintiff stated difficulties with memory, but was able to understand and follow simple instructions. He reviewed her medications and that she reportedly took these as prescribed.

The mental status exam revealed that the plaintiff was cooperative and forthcoming, a poor historian regarding past alcohol and substance abuse, was oriented to

person, place, and day of month, but thought the month was June and the year was 2007 (Tr. 247). Dr. Fishburne reported that the plaintiff made good eye contact, rocked back and forth some during the interview, had a tearful affect, a depressed and sad mood, had difficulty counting by 3s, exhibited mildly impaired concentration, marginally impaired short-term memory, and thinking that reflected some paranoia and hallucinations (Tr. 247). He noted that the plaintiff reported that she had not heard voices for the past three months (since restarting her medications), but that these voices told her she was ugly, stupid, could not do anything, and had something wrong with her mind (Tr. 247). Dr. Fishburne reported that the plaintiff also endorsed seeing things such as somebody coming towards her, was paranoid, and felt people were talking about her and looking at her. Dr. Fishburne reported that the plaintiff performed simple mental arithmetic and verbal abstractive tasks at a mildly retarded level, and he judged that her intelligence fell in the mildly mentally retarded range (Tr. 248).

Dr. Fishburne referred to evidence of impulse control issues associated with domestic violence and reported that the plaintiff's insight into her situation was poor. He opined that the plaintiff would require the assistance of a responsible adult if she were to qualify for benefits (Tr. 249). Dr. Fishburne's final diagnoses included a GAF of 55 and schizoaffective disorder, polysubstance dependence in remission, and mild mental retardation (Tr. 248).

On June 30, 2009, the plaintiff presented to the Charleston Mental Health Center to reconnect with services. She reported continued depression and psychotic symptoms, poor concentration, poor sleep, increased appetite, low energy, and increased paranoia. The clinician noted that the plaintiff kept cotton balls in her ears in an attempt to help relieve the audio hallucinations, kept knives in her room, was anxious after being hit by a car, was having nightmares, crying spells, felt hopeless, was hypersensitive, and her

8

family was afraid for her safety. Urgent Needs/Risk Assessment included increased paranoia, audio hallucinations, fear of police, avoidance of cars and people, depressed and anxious mood, tearful affect, thought blocking, and impaired insight and judgment. The clinician arranged for admission to Palmetto Lowcountry Behavioral Health (Tr. 324).

The plaintiff was admitted to Palmetto Lowcountry Behavioral Health on June 30, 2009, secondary to noncompliance with her medication, as well as reports of hearing voices and feeling suicidal.  Dr. Steven Lopez conducted an intake psychiatric evaluation on July 1, 2009, indicating that the plaintiff went off of her medications because she had to pay for other medications associated with the motor vehicle accident. Dr. Lopez noted that the plaintiff required stabilization and reviewed her psychiatric, medical, social, and family histories. Mental status exam revealed that the plaintiff had a depressed mood, congruent affect, suicidal ideation, auditory hallucinations, psychotic symptoms, average intellect, and severely impaired judgment and insight (Tr. 339). Dr. Lopez's initial plan included adding Effexor XR and enrollment in individual and group therapy. His diagnostic impressions included a GAF of 40[4] and major depressive episode with psychotic features, post traumatic stress disorder, and broken ankle (Tr. 339). At her discharge on July 4, 2009, the plaintiff was not experiencing suicidal ideation or any hallucinations, her prognosis was good, and her GAF score was 60.  Discharge medications included Risperdal, Effexor XR, and Trazodone. Dr. Lopez advised the plaintiff to follow-up with mental health (Tr. 336-37).

The plaintiff returned to Dorchester County Mental Health in July 2009, reporting that she already felt better but wanted to resume services for depressed mood, paranoid delusions, audio hallucinations, decreased sleep, poor energy, and difficulty concentrating (Tr. 387). Diagnoses included schizo-affective disorder, post traumatic stress

---

[4]A GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See DSM-IV*, 32-34 (Text Revision 4th ed. 2000).

disorder, ankle injury, hearing loss to right ear, and a GAF of 50 (Tr. 387-88). The clinician gave the plaintiff samples of Effexor XR and Invega (used for treating symptoms of schizophrenia). Psychiatric Medical Assessment Orders and Service notes dated August 17, 2009, indicate that the plaintiff was feeling much better since going back on her medications (Tr. 389). The clinician refilled the plaintiff's Effexor XR, Risperdal, Trazodone, and provided samples of Invega (Tr. 390). On September 21, 2009, the clinician noted that the plaintiff was hyper verbal and stressed because of the lump in her neck (afraid she had cancer) and because she found out that her aunt died (Tr. 391). Her boyfriend reported that the plaintiff took to covering all the windows, was afraid of the dark, and hid knives all over the house. The plaintiff reported that she did this because she did not feel safe. Diagnoses and treatment remained unchanged from prior visits (Tr. 392).

Psychiatric Medical Assessment Orders and Service Notes dated October 19, 2009, indicate that the plaintiff's symptoms had improved, her mood was stable, and she was anxious about surgery to have tonsils removed (Tr. 393). Diagnoses and treatment remained unchanged (Tr. 394). Psychiatric Medical Assessment Orders and Service Notes from March, May, and July of 2010 indicate that the mass in the plaintiff's throat was growing, and she was fearful because of this (Tr. 457). The clinician reported in March and May that the plaintiff was having difficulty sleeping, sometimes walked the streets at night, was anxious, had difficulty swallowing and at times breathing, was having difficult speaking, and had to leave the room to try to bring up secretions (Tr. 457, 459). Diagnoses changed at this time to include enlarged tonsil needing removal and hearing loss to right ear (Tr. 458). Trazodone was discontinued and Clonazepam prescribed. In May 2010, the plaitniff was noted to remain very anxious because of difficulty swallowing and needing a surgery that she could not afford with repeated denial of benefits (Tr. 459, 461).

The plaintiff underwent a psychological consultative examination on February 3, 2010 (Tr. 400). Bonnie Cleaveland, Ph.D., noted that the plaintiff walked with a cane,

made good effort on testing, and appeared to have a depressed affect. Dr. Cleaveland reported that the plaintiff was cooperative during the interview and testing, and judged the test results to be a valid indicator of her level of her level of functioning (Tr. 400). However, later in the report, Dr. Cleaveland stated that the validity of the plaintiff's testing was in question since she appeared to be "suspiciously vague" in her reporting during the interview, and therefore, her scores should be considered her minimal level of functioning (Tr. 401). The doctor then noted that the plaintiff was administered the Weschler Adult Intelligence Scale-IV ("WAIS-IV") and achieved a Full Scale IQ score of 56 (Tr. 402). Dr. Cleaveland went on to note that the plaintiff's "scores are MINIMAL scores, and may be much higher," and her score should be confirmed with other evidence. The doctor concluded that the plaintiff's social functioning was impaired; she could concentrate and persist on simple tasks, but could not perform complex tasks; she could not perform basic activities of daily living to care for herself, she was unable to manage funds if awarded, and she required supervision (Tr. 403). Dr. Cleaveland added that she had serious questions about the plaintiff's truthfulness, she suspected at least intermittent substance abuse that was not revealed, and there had either been a significant cognitive decline or the plaintiff provided many fewer details than in the past (Tr. 403-404).

In May 2009, state agency psychologist Michael Neboschick, Ph.D., reviewed the plaintiff's medical records and combination of impairments (Tr. 286-98, 300-301) and determined that she could understand and remember simple instructions, sustain attention for simple, structured tasks for 2-hour periods, adapt to changes if gradually introduced and infrequent, make simple work-related decisions, and work in the presence of others and accept supervision (Tr. 302). Eight months later, state agency psychologist Lisa Clausen, Ph.D., reviewed the plaintiff's medical records and impairments (Tr. 406-18, 420-21) and concluded that she was able to understand and remember simple, but not detailed, instructions and carry out short and simple instructions and maintain attention and

11

concentration for at least 2-hour periods, but that she would work best in situations that did not require ongoing interaction with the public (Tr. 422).

***Physical Health***

The plaintiff was hit by a car on February 6, 2009. On February 13, 2009, Dr. Blake Ohlson performed an open reduction and internal fixation surgery to repair a bimalleolar fracture of her left ankle (Tr. 269-70). Dr. Ohlson saw the plaintiff in follow-up on March 25, 2009, noting that she seemed to be healing well (Tr. 281). He removed the cast, placed the plaintiff into a boot, and advised no weight bearing for two additional weeks. Dr. Ohlson saw the plaintiff for her six-week follow-up status post ankle surgery on April 21, 2009, noting that she was ready to begin progressive weight bearing in the fracture boot and was to gradually transition to an ankle brace and athletic shoe (Tr. 360). On June 3, 2009, Dr. Ohlson planned to begin the plaintiff in physical therapy because she was so hesitant to move her ankle and he wanted to see her out of the boot and into an ankle brace with an athletic shoe (Tr. 359). He prescribed Naprosyn and Lortab for pain and advised follow-up in six weeks.

Franklin C. Fetter Clinic notes dated August 13, 2009, indicate that the plaintiff presented with right ear pain accompanied by intermittent ringing in her ear (Tr. 370). Exam notes are difficult to read but appear to indicate that the physician saw some swelling to the affected area and prescribed an antibiotic for what was felt to be otitis media. Equally difficult to read notes dated August 31, 2009, appear to indicate that the plaintiff continued to experience right ear pain associated with swelling to right side of her throat (Tr. 369). The physician requested an ENT consult stating that the plaintiff was not responding to antibiotics (Tr. 368).

Dr. Ohlson saw the plaintiff on September 2, 2009, for her six month follow-up status post ankle surgery, noting much improvement and that she complained of intermittent swelling, pain changes with weather, and was still using the ASO brace (Tr. 358). He

explained to the plaintiff the possibility of post traumatic arthrosis occurring after the type of fracture she sustained and advised her to follow-up on an as needed basis.

Daniel Gallagher, M.D., of MUSC Hollings Cancer Center initially examined the plaintiff on September 24, 2009, for evaluation of a three-month history of right ear and throat pain accompanied by pain on swallowing (Tr. 376).  He reported that the plaintiff rated the pain at 4/10 on the pain scale and stated it was worse with eating.  On exam, Dr. Gallagher noted diffuse enlargement of the right tonsil to 3 cm, mobile, firm, and tender to palpation and two small 1-2mm smooth nodules on the right true vocal cord and one small firm mobile 1 cm JD node to the right neck (Tr. 377).  He performed a biopsy and assessed this as a tonsillar neck mass with possible T2 tonsil lesion - biopsy pending and vocal nodules from which he planned to obtain tissue in the near future (Tr. 378).  Preoperative diagnosis included right tonsil mass (Tr. 379).

Dr. Gallagher saw the plaintiff in follow-up on October 15, 2009, noting that the biopsy revealed benign lymphoid tissue and that the plaintiff continued to experience severe throat pain and persistently enlarged tonsils that had not improved with multiple courses of antibiotics (Tr. 372).  Dr. Gallagher observed that though the plaintiff's right tonsil was diffusely enlarged, and she had two small nodules on her right true vocal cord, she was in no apparent or airway distress, she was alert and oriented, her true vocal cords were fully mobile, and her nasal cavity and nasopharanx had no lesions or masses (Tr. 373).  Despite the negative biopsy, Dr. Gallagher stated that he was highly suspicious, and the plan was for him to perform a tonsillectomy and microlaryngoscopy in the near future (Tr. 374).

On March 18, 2010, Tanya Fancy, M.D., of Hollings Cancer Institute stated in a letter that the plaintiff had experienced tonsil pain for 6-8 months without improvement, and that while her tonsil had been biopsied and the findings were benign, her tonsil was still enlarged and suspicious.  The doctor concluded that she wanted to perform a bilateral tonsillectomy as the procedure was crucial to fully evaluate malignancy, obtain tissue for a

13

pathologic diagnosis, and to evaluate her vocal cord nodules.  She noted that the plaintiff was losing weight due to difficult swallowing and requested prompt attention and assistance (Tr. 464).

In May 2009, state agency physician Jean Smolka, M.D., reviewed the plaintiff's medical records and combination of impairments, and concluded that she could occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, and stand/ walk and sit for about 6 hours each in an 8-hour day.  The doctor also determined that the plaintiff had a limited ability to push/pull with her lower extremities (Tr. 305) and was limited to occasional climbing (Tr. 306).  Nearly a year later, state agency physician William Cain, M.D., reviewed the plaintiff's medical records and impairments and determined that she could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, and sit and stand/walk for about 6 hours each in an 8-hour day (Tr. 433).  The doctor added that the plaintiff could never climb ladders, ropes, or scaffolds; she was limited to occasional stooping, kneeling, crouching, crawling, and climbing stairs and ramps (Tr. 434), and she was to avoid all exposure to hazards, including unprotected heights (Tr. 436).

### Administrative Hearing Testimony

At the December 2010 administrative hearing (Tr. 28-46), the plaintiff testified that she stopped working because she was hearing voices, and she thought people were talking about her (Tr. 31).  The plaintiff stated that she was hit by a car on February 6, 2009, and she suffered a severe ankle injury, resulting in surgery to implant titanium bolts and screws; she was diagnosed with paranoid schizophrenia; and she had a lump in her throat (Tr. 32).  The plaintiff then stated that the doctors at Hollings Cancer Center wanted to remove the lump in her throat (Tr. 33).  The plaintiff also testified that she heard voices every other day, her hallucinations could last three to four hours, after the hallucination ended she did not remember where she was or what had happened, and she felt physically drained after the hallucination (Tr. 37-38).  The plaintiff further stated that she was taking

14

Clonazepam, Effexor, and Risperdal, and the medications helped her rest. She added that she had symptoms of post-traumatic stress disorder every other day, she felt as if she could not trust anyone, and someone was out to get her (Tr. 38-40). The plaintiff additionally noted that she could not drive and take her medication, she had difficulty sleeping, she did not want to go outside, she did not cook because she did not want to burn the house down, she was bothered by noise and crowds, and sometimes she did not remember things (Tr. 40-41). Lastly, the plaintiff testified that she could not swallow due to her throat issues, her throat swelling had caused her to lose weight, and she could not be an inspector or assembler in a clean environment because she would think that someone was talking about her (Tr. 42).

John Skinner also testified at the administrative hearing. He stated that he had been the plaintiff's boyfriend for nine years (Tr. 43). He stated that the plaintiff barricaded her room, windows, and doors, kept knives under her mattress, and was often afraid that someone was coming to get her. The witness testified that these episodes occurred two to three times a week and lasted for several hours. He reported that the plaintiff did not seem to understand what was happening during these episodes and had become violent in the past including biting him, injuring his knee and finger, and throwing things at him (Tr. 44). The witness stated that the plaintiff appeared frightened during these episodes and often heard things that he did not hear. He explained that after the episodes end, he tried to make sure the plaintiff took her medication and ate (Tr. 44-45).

## .**ANALYSIS**

The plaintiff argues that the ALJ erred by:  (1)  misapplying the Commissioner's special technique for evaluating mental impairments; (2)  violating the Commissioner's rules for conducting step two of the evaluation process; (3)  issuing a step three determination that was not supported by substantial evidence; and (4)  failing to meet

the Commissioner's burden at step five of the evaluation process by failing to elicit vocational expert testimony..

***Mental Impairments***

The plaintiff first argues that the ALJ erred in applying the Commissioner's special technique for evaluating mental impairments (pl. brief 3-18). The regulations establish a special technique that must be followed when evaluating mental impairments at each stage of the review process. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the ALJ will evaluate the pertinent symptoms and laboratory findings to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1). After that evaluation is complete, the ALJ will rate the degree of functional limitation arising from the impairment, specifically looking at activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(2), (3), 416.920a(c)(2), (3). The regulations provide that "[a]ssessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation." *Id.* §§ 404.1520a(c)(1), 416.920a(c)(1). Once the functional areas are rated, the ALJ will determine the severity of the claimant's mental impairment. *Id.* §§ 404.1520a(d), 416.920a(d).

The plaintiff first notes that the regulations direct adjudicators to conduct the broad categorical assessment of functioning before reaching step two (severity). Here, the ALJ made his step two findings as to the severity of the plaintiff's impairments *prior* to conducting the broad categorical assessment of functioning (*see* Tr. 14-16). As argued by the Commissioner, however, the special technique is also part of the analysis for listings under section 12.00, and thus it was not error for the ALJ to include his ratings as to the degree of functional limitation arising from the plaintiff's mental impairments in his step three analysis.

16

The plaintiff next argues that the ALJ erred in analyzing her limitations under the four broad categories of functioning. The ALJ determined that the plaintiff was mildly restricted in her activities of daily living; had moderate difficulties with social functioning and concentration, persistence, and pace; and no episodes of decompensation, which have been of extended duration (Tr. 15). The plaintiff argues that the ALJ erred by failing to consider "all relevant evidence to obtain a longitudinal picture of [her] overall degree of functional limitation." 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1). The undersigned agrees.

In finding that the plaintiff had mild restrictions in her activities of daily living, the ALJ stated as follows:

> The claimant reported in July 2009 that she could support herself and her grandson and that she was able to take care of herself (Exhibit 15F). She reported in March of 2010 that she was able to manage self care, with some help from her sister. The claimant can don and doff shoes and socks without apparent difficulty and ambulate without assistance. (Exhibit 20F).

(Tr. 15). First, as noted by the plaintiff, the fact that she could take her shoes on and off without difficulty does not appear to be particularly relevant to an assessment of the activities of daily living of a grown woman. Second, the only July 2009 evidence contained in exhibit 15F appears to be a Physician's Medication Assessment Orders and Service Notes dated July 16, 2009, indicating that the plaintiff was suffering from depressed mood, paranoid delusions, audio/visual hallucinations, decreased sleep, poor energy, and poor concentration (Tr. 387). Third, the citation to evidence stating that the plaintiff could manage self care with assistance from her sister does not support a finding that the plaintiff only had mild restrictions in her activities of daily living. Moreover, Physician's Medication Orders and Service Notes dated June 24, 2008, indicated that the plaintiff spent all day in the house because of residual paranoid ideation and audio hallucinations (Tr. 334). Dr.

17

Fishburne reported in August 2008 that the plaintiff's activities of daily living included staying in the house, cleaning, and watching some television. He noted that the plaintiff was limited because she was not permitted to use the stove or babysit, could not drive a car, and did not have a driver's license. He reported that a friend drove her to the evaluation, and the plaintiff's daughter did the shopping and cooking (Tr. 246).

Furthermore, mental health notes from June 2009 reveal that the plaintiff kept cotton balls in her ears in an attempt to help relieve the audio hallucinations, kept knives in her room, was anxious after being hit by a car, was having nightmares, crying spells, felt hopeless, was hypersensitive, and her family was afraid for her safety. Urgent Needs/Risk Assessment included increased paranoia, audio hallucinations, fear of police, avoidance of cars and people, depressed and anxious mood, tearful affect, thought blocking, and impaired insight and judgment (Tr. 324). Psychiatric Medical Assessment Orders and Service Notes from August 2009 reveal that the plaintiff's boyfriend reported that she covered all the windows, was afraid of the dark, and hid knives all over the house (Tr. 392). Dr. Cleaveland's Clinical Functional Assessment included that the plaintiff was unable to perform basic activities of daily living to care for herself and required supervision; was impaired by depression and psychotic symptoms; was unable to manage funds if awarded; and was unable to perform complex tasks (Tr. 403). Witness John Skinner testified that the plaintiff barricaded her room, windows, and doors, kept knives under her mattress, and was often afraid that someone was coming to get her (Tr. 44). The witness testified that these episodes occurred two to three times a week and lasted for several hours. He reported that the plaintiff did not seem to understand what was happening during these episodes and had become violent in the past including biting him, injuring his knee and finger, and throwing things at him (Tr. 44).

As argued by the plaintiff, the ALJ's decision does not indicate that he considered any of the foregoing evidence in finding that she suffered only mild restrictions

18

in her activities of daily living.  Upon remand, the ALJ should be directed to consider this relevant evidence of the longitudinal picture regarding the plaintiff's activities of daily living.

With regard to the second broad functional area, the ALJ found that the plaintiff had moderate difficulties in social functioning.  He provided the following sentence in support:  "The claimant's mood is stable but she would have some difficulty interacting with the public" (Tr. 15).  The plaintiff argues that the ALJ failed to properly analyze her limitations in this regard in light of all relevant evidence.  This court agrees.

The plaintiff testified she heard voices that frightened her and that while she was unsure how frequently she experienced these episodes, the last episode she remembered lasted three to four hours (Tr. 37-38).  She stated that she was not really aware of what was happening during these schizophrenic episodes and that she felt drained when they were over (Tr. 38).  The plaintiff testified that she took Clonazepam, Effexor, and Risperdal for this condition, which made her sleepy (Tr. 38-39).  The plaintiff testified that her condition made everything a constant struggle and that she felt like she could not trust anyone, and also made it difficult for her to sleep through the night (Tr. 39-40).  The plaintiff stated she felt like someone was always out to hurt her (Tr. 40).  She described experiencing difficulty hearing machinery noises, being in crowds, and concentrating (Tr. 41).  The plaintiff explained that it was primarily her paranoia that prevented her from working (Tr. 41-42).

Charleston County Mental Health notes from May of 2008 contain a Trauma History including a violent stabbing incident, sexual abuse by the plaintiff's brother during childhood, and physical abuse by her child's father and other males (Tr. 236).  The Social, Economic, and Cultural Assessment indicated that the plaintiff had a GED, was unemployed with a past work history including housekeeping and laundry services, was arrested several times for criminal domestic violence including fighting with her child's father, and served 20 to 30 days before being released (Tr. 238).  The Appendix to the

19

Clinical Assessment indicated, among other things, that the plaintiff suffered from serious interpersonal impairment as a result of being totally socially isolated, lacked intimacy in social relationships, showed an inability to confide in others, and lacked social support (Tr. 325). Dr. Fishburne also referred to the plaintiff's multiple arrests for domestic violence (Tr. 245). He also noted that the plaintiff felt paranoid when out in crowds, thought that people were talking about her, and had difficulty getting along with supervisors and co-workers for this reason (Tr. 246).

The ALJ's decision does not indicate that he considered any of this evidence in finding that the plaintiff suffered moderate difficulties in social functioning. Upon remand, the ALJ should be directed to consider this relevant evidence of the longitudinal picture regarding the plaintiff's social functioning.

With regard to the third broad functional area, the ALJ found that the plaintiff had moderate difficulties with regard to concentration, persistence, or pace. He provided the following sentence in support: "The claimant's psychiatric medications cause her some fatigue, and her psychological symptoms cause concentration deficits" (Tr. 15). The plaintiff has not cited any evidence that she contends the ALJ failed to consider in this regard.

Lastly, the ALJ found that the plaintiff had not experienced any episodes of decompensation of extended duration, as the evidence of record did not reveal any exacerbations or temporary increases in her symptoms accompanied by a loss of adaptive functioning, manifested by difficulties performing daily activities or maintaining social relationships, concentration, persistence, or pace (Tr. 15).

Episodes of decompensation "may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). The regulations define repeated episodes of decompensation, each of extended duration, as

meaning three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.*  However, if a claimant has experienced "more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." *Id*.

The plaintiff argues that the ALJ failed to consider the evidence of frequent episodes of decompensation of shorter duration.  This court agrees.  The plaintiff cites evidence showing that she did very well when placed in a highly structured psychological support system and experienced decompensation almost immediately thereafter (*see* pl. brief 10-16).  For example, Physician's Medical Orders and Service Notes from Dorchester County Mental Health dated February 8, 2007, indicate that the plaintiff had been in and out of treatment for 15 years (Tr. 228).  The physician noted that the plaintiff admitted that she had difficulty following through with her treatment and recognized that her illness always returned when she discontinued her medications. He reported that the plaintiff's intention was to be more consistent because she was tired of her decompensation cycle. The physician further reported that the plaintiff was hospitalized three to four times in the past for suicidal ideation, audio hallucinations, one suicide attempt, and past history of alcohol and cocaine dependence from which she had abstained since 2002 (Tr. 228).

A Charleston County Initial Clinical Assessment dated May 19, 2008, indicates that the plaintiff presented complaining of feeling paranoid that people were talking all around her and hearing voices tell her that she was stupid (Tr. 234).  The Mental Status Exam indicated that the plaintiff had a tearful affect, depressed mood, loud speech, racing thought process, paranoid thought content, was experiencing auditory and visual hallucinations, exhibited poor judgment, had difficulty remembering things, was easily

distracted, could not divide 100 by 5, and displayed a below average fund of knowledge (Tr. 241-42).

Physician's Medication Orders and Services Notes dated May 28, 2008, indicate that the plaintiff presented for follow-up reporting that she quit her job because she felt very confused, extremely paranoid, and depressed (Tr. 227). The Appendix to the Clinical Assessment for Adults indicated that the plaintiff: 1) had not attempted suicide during the past twelve months, 2) lacked any legitimate productive role, 3) had a serious role impairment in her main productive role, e.g., consistently missing at least one full day of work per month as a direct result of her mental health, and 4) had a serious interpersonal impairment as a result of being totally socially isolated, lacked intimacy in social relationships, showed an inability to confide in others, and lacked social support (Tr. 325).

Dr. Fishburne's mental status exam in August 2008 revealed that the plaintiff was cooperative and forthcoming, a poor historian regarding past alcohol and substance abuse, was oriented to person, place, and day of month, but thought the month was June and the year was 2007 (Tr. 247). Dr. Fishburne reported that the plaintiff made good eye contact, rocked back and forth some during the interview, had a tearful affect, a depressed and sad mood, had difficulty counting by 3s, exhibited mildly impaired concentration, marginally impaired short-term memory, and thinking that reflected some paranoia and hallucinations (Tr. 247). He referred to evidence of impulse control issues associated with domestic violence and reported that the plaintiff's insight into her situation was poor. He opined that the plaintiff would require the assistance of a responsible adult if she were to qualify for benefits (Tr. 249).

In June 2009, clinical notes show that the plaintiff kept cotton balls in her ears in an attempt to help relieve the audio hallucinations, kept knives in her room, was anxious after being hit by a car, was having nightmares, crying spells, felt hopeless, was

22

hypersensitive, and her family was afraid for her safety. Urgent Needs/Risk Assessment included increased paranoia, audio hallucinations, fear of police, avoidance of cars and people, depressed and anxious mood, tearful affect, thought blocking, and impaired insight and judgment. She was admitted to Palmetto Behavioral Health for several days of treatment. Dr. Lopez noted that the plaintiff required stabilization and reviewed her psychiatric, medical, social, and family histories. Mental status exam revealed that she had a depressed mood, congruent affect, suicidal ideation, auditory hallucinations, psychotic symptoms, average intellect, and severely impaired judgment and insight (Tr. 339). His diagnostic impressions included a GAF of 40 and major depressive episode with psychotic features and post traumatic stress disorder (Tr. 339). The plaintiff was discharged without suicidal or homicidal ideations and without audio or visual hallucinations (Tr 336).

In September 2009, the plaintiff's boyfriend reported that the plaintiff covered all the windows, was afraid of the dark, and hid knives all over the house. The plaintiff reported that she did this because she did not feel safe (Tr. 392).

The ALJ's decision does not indicate that he considered any of this evidence of the plaintiff's need for a more structured psychological support system. Upon remand, the ALJ should be directed to consider this relevant evidence of the longitudinal picture regarding the plaintiff's episodes of decompensation.

### *Remaining Allegations of Error*

As the undersigned recommends remand based on the ALJ's failure to properly consider the plaintiff's limitations under the four broad areas of functioning in the special technique, the plaintiff's remaining allegations are not addressed as they may be rendered moot on remand. However, on remand, the undersigned recommends directing the ALJ to consider and address whether the plaintiff's tonsil mass and vocal cord nodules are severe impairments and what impact, if any, they have on her residual functional capacity. The undersigned also recommends that the ALJ consider whether the plaintiff's

alleged intelligence impairment is a severe impairment, specifically addressing Dr. Cleaveland's findings and resolving the inconsistencies or insufficiencies in her report from the consultative exam in February 2010.  The undersigned further recommends directing the ALJ to consider and address whether the plaintiff's nonexertional limitations impact her residual functional capacity to perform work of which she would otherwise be exertionally capable and to elicit vocational expert testimony, if necessary, at the fifth step of the sequential evaluation process.

### CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

February 7, 2014
Greenville, South Carolina